**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SUPPLY CHAIN ENGINEERING, LLC,

Plaintiff,

v.                                                          Case No._____

CEC ENTERTAINMENT, LLC,

Defendant.

_____

**COMPLAINT**

Plaintiff Supply Chain Engineering, LLC ("Plaintiff" or "Supply Chain Engineering, LLC") files this Complaint against Defendant CEC Entertainment, LLC ("Defendant" or "CEC Entertainment, LLC") and alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for breach of contract and breach of the implied warranty of good faith and fair dealing under Florida law.

2. Plaintiff is seeking payment for inventory for which CEC is contractually obligated to pay but has, to date, refused to pay, as well as damages for breaching the parties' long-term contract.

**THE PARTIES**

3. Plaintiff Supply Chain Engineering, LLC is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Safety Harbor, Florida.

4. Defendant CEC Entertainment, LLC is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Irving, Texas. One of CEC's

key brands is Chuck E. Cheese. On information and belief, Chuck E. Cheese operates close to 700 stores globally, 26 of which are located in the State of Florida.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action under diversity of citizenship.

6. There is complete diversity of citizenship between Plaintiff and Defendant in this case. The amount in dispute in this action, exclusive of interest and costs, exceeds the sum of $75,000. Therefore, this Court has jurisdiction over this dispute under 28 U.S.C. § 1332.

7. This court has personal jurisdiction over Defendant CEC Entertainment, LLC because CEC regularly conducts business, through its Chuck E. Cheese stores, in the State of Florida. Further, CEC entered into a supply contract with SCE, a Florida corporation. Therefore, CEC has sufficient minimum contacts with Florida to satisfy due process and allow this Court to exercise jurisdiction over it.

8. Venue in this district is proper because the parties' contract calls for venue in this court.

## FACTS

9. CEC Corporation and SCE signed a five-year Inventory Purchase Agreement (the "Agreement") on January 2, 2024. A true and correct copy of the Agreement is attached to this Complaint as Exhibit A.

10. Prior to entering into the Agreement, SCE had been supplying CEC with various goods for use in its Chuck E. Cheese stores nationwide.

11. SCE's relationship with CEC began in 2015, when Dean Satchwell (the then-CEC Vice President of Supply Chain) reached out to Tim Harrison to ask if he would be interested in designing a Consolidation/Redistribution platform for CEC.

12. Mr. Satchwell was aware that Mr. Harrison was the original architect of the "Food Service Chain Redistribution" system, having designed and implemented programs for Darden Restaurants, Chick-fil-A, Arby's, Denny's, Golden Corral, Hardees, IHOP, Applebee's, and many others.

13. At the time, CEC suppliers were using many less than truckload (LTL) shipments, which were very inefficient, costly, and provided poor service.

14. In 2016, Mr. Harrison formed Supply Chain Engineering, LLC, to exclusively operate as CEC's consolidation and redistribution company.

15. SCE opened two distribution centers and consolidated LTL Vendors/Products into Mostly Truckloads, utilizing full trailers to maximize efficiency, reduce costs, and improve shipping speed.

16. Using this system, SCE serviced Performance Food Group (PFG) operating distribution locations for CEC.

17. Under SCE's system, CEC can place any products into the system it needs, and SCE handles all vendor communications to fulfill those requests. This system is still in operation today.

18. In recognition of SCE's critical role to maintaining a reliable and cost-effective source of goods, CEC invited SCE to enter into a five-year contract, which the parties signed on January 2, 2024.

19. The Agreement provides that CEC is obligated to purchase from SCE "all CEC Goods in SCE's possession, custody, control" and CEC Goods "for which SCE has a contractual obligation to pay a manufacturer thereof." Exhibit A at ¶ 5.

20. CEC identifies SCE as having "critical vendor status" in the Agreement, acknowledging and agreeing that "SCE sources and supplies CEC with goods that are unique to CEC and/or are limited in supply." Exhibit A at ¶ 7. CEC agreed that it would identify SCE as a critical vendor if it became a debtor in a federal bankruptcy proceeding.

21. In June 2020, CEC filed for chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas.

22. On June 25, 2020, CEC filed an emergency motion authorizing it to pay prepetition obligations to critical vendors, including SCE. In that emergency motion, CEC represented to the bankruptcy court that "[a]ny disruption in the Debtors' access to critical goods and services would have a far-reaching and adverse economic and operational impact on their business."

23. The Agreement can be terminated early after the third year but only after written notice of the termination "at least one hundred and eighty (180) [sic] prior to the effective date thereof." Exhibit A at ¶ 8.

24. The Agreement also provides that "in the event of a Triggering Event, CEC agrees to pay SCE the sums due for purchasing the CEC goods within forty-five (45) days following the receipt by CEC of the Notice required in paragraph 2 above." Exhibit A at ¶ 6.

25. During the course of the parties' relationship, CEC has, at times, ordered goods to be shipped to SCE, which were stored in SCE's distribution center.

26. CEC and SCE had different arrangements for different products. For instance, SCE sourced ballons directly for CEC from China, which saved CEC approximately $600,000 over

4

domestic sources of the same product. For other products, such as Knobby Balls, CEC contracted with the vendor Fun Express, had those products shipped to SCE, and SCE paid the bill. For a third product, media kits for CEC photo booths, CEC contracted for them directly and had them shipped into SCE.

27. In September 2024, Mr. Harrison of SCE spoke with Mr. Barron of CEC regarding the Knobby Balls. In an email dated September 23, 2024, Mr. Harrison memorialized their conversation in which CEC asked SCE to put on hold the sale of Knobby Balls until January 2025, when CEC advised it would reactivate that item. At the time, SCE had approximately 500 cases of Knobby Balls on hand for CEC.

28. During their conversation, Mr. Barron asked Mr. Harrison to bring in another 6,723 cases of Knobby Balls, anticipating the reactivation of that product in January 2025. Mr. Barron asked SCE to pay the vendor, Fun Express, for those cases. SCE obliged.

29. Mr. Barron failed to keep his promise to reactivate the Knobby Balls. Those goods have been stored in SCE's facility since then. SCE incurs storage costs for those goods.

30. CEC also ordered media kits for the photo booths in their stores, and again had them shipped to SCE. After CEC purchased new photo booths that rendered those media kits obsolete, SCE has stored those kits in its center with no compensation from CEC.

31. These items comprise what the parties refer to as "dead stock." CEC has acknowledged that it is responsible for paying for these goods, which is approximately $1.8 million. They never did.

32. There is additional inventory of CEC Goods that SCE purchased for CEC under the terms of the parties' Agreement, or that SCE is financially committed to order.

33. On October 22, 2025, SCE provided CEC with a complete inventory of "dead stock" and on hand/committed inventory of CEC Goods. That invoice totaled $5,476,305 (of which $1.8 million was the long overdue "dead stock."). The Agreement required CEC to pay for the CEC Goods within 45 days. CEC has failed to do so.

34. For the past 10 years, SCE has ordered CEC Goods on a regular cycle to ensure that the goods are purchased with sufficient lead time to ensure the goods arrive on time.

35. CEC has never required SCE to obtain pre-authorization before ordering the goods over the course of those 10 years. When the parties have spoken on the phone, CEC has confirmed that it is "business as usual" until the next call, meaning SCE should continue to order goods in the ordinary course as it has over the course of the Agreement.

36. SCE has sent CEC an inventory report at least monthly, often more frequently, for the entirety of their business relationship.

37. To date, SCE has, on average, 3.5 months' worth of CEC Goods on hand, which is a typical level of inventory for CEC. The value of those goods is approximately $3.7 million.

38. On July 29, 2025, CEC announced its intent to cancel the contract in an email message stating that CEC would "be moving in a different direction and therefore we will be transitioning all of the RFP items [SCE] are currently providing to CEC to a different supply chain."

39. CEC also stated in that email that it would work with SCE to "wind down inventory" and asked for a list of items on hand and work in progress for CEC to "evaluate for consideration."

40. The July 29, 2025, email breaches the contract in two ways.

41. First, it purports to terminate the contract 17 months before the earliest date it is first eligible to do so and does not provide 180 days' notice.

42. Second, CEC assertion that it would "evaluate for consideration" CEC Goods on hand and in progress ignores CEC's contractual obligation to pay fair market value for those goods.

43. SCE objected to CEC's email as contrary to the parties' five-year contract. CEC responded in September by claiming—for the first time—that SCE had failed to provide inventory reports as requested.

44. SCE responded that it has provided CEC with an inventory report at least monthly for the past eight years, despite the fact that the contract does not require those reports, and CEC had never requested them before the July email.

45. Representatives for CEC and SCE had a discussion in September, after which CEC's VP of Supply Chain, Antonio Barron, promised to "get back to SCE" about the inventory issue, including long-overdue payment for approximately $1.8 million in "dead stock" that CEC acknowledged it owed SCE.

46. CEC did not provide any further communications to SCE, and did not pay for the dead stock, or any of the other inventory listed on the report, totaling approximately $3.7 million. In all, CEC owes SCE approximately $5.5 million.

47. CEC has also stated that it intends to drastically reduce the goods that it purchases from SCE. The called-for reduction would eliminate over 70% of the contracted-for goods, and would frustrate the purpose of the parties' contract.

**FIRST CLAIM FOR RELIEF**
(Breach of Contract)
(Against Defendants –CEC Entertainment, LLC)

48. SCE incorporates by reference paragraphs 1-47, above.

49. On January 2, 2024, Plaintiff and Defendant entered into a contract by which Plaintiff CEC was obligated to purchase from SCE any CEC Goods on hand with SCE.

50. The annual value of that Agreement is approximately $15 million, or roughly $75 million over the course of the five-year Agreement.

51. SCE has duly performed all of its obligations and duties under the contract.

52. SCE has demanded that CEC pay $1.8 million for dead stock but CEC has failed to do so.

53. SCE has failed to pay for CEC Goods on hand or for which SCE is committed within 45 days, as required under the Agreement.

54. CEC has breached the contract by refusing to pay SCE the agreed upon sum for "dead stock" and inventory, in the amount of $5.5 million.

55. In addition, CEC effectively canceled its five year contract with SCE after only 17 months—19 months before the earliest date on which Agreement allows either party to provide notice of termination, and 25 months before that termination can take effect.

56. On January 30, 2026, Plaintiff demanded that Defendant fulfill its obligations under the contract, but Defendant refused.

57. As a result of Defendant's breaches of contract, Plaintiff has been damaged in an amount to be determined by the court, but no less than $30,000,000.00.

**SECOND CLAIM FOR RELIEF**
(Breach of Implied Covenant of Good Faith and Fair Dealing)
(Against Defendants –CEC Entertainment, LLC)

58. SCE incorporates by reference paragraphs 1-57, above.

59. An implied covenant of good faith and fair dealing exists in all contracts. CEC violated the implied covenant of good faith and fair dealing in the contract in this case.

60. SCE and CEC entered into a contract, as discussed above.

61. SCE did all, or substantially all, of the significant things that the contract required it to do.

62. All conditions required for CEC's performance have occurred.

63. CEC's conduct in attempting to terminate the contract, then terminating the majority of the goods subject to the contract, is not consistent with parties' reasonable expectations under paragraphs 5 and 6 of the Agreement.

64. Moreover, CEC's attempt to terminate the contract was in bad faith, as was its subsequent effort to manufacture a "cause" for termination that does not exist in the contract.

65. As a result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined by the court, but no less than $30,000,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

1. The entry of judgment in favor of the plaintiff on each and every cause of action;
2. The award of the requested damages in the amount of $30,000,000.00;
3. The award of costs of the suit and attorney's fees, if applicable; and
4. Such other relief as the Court deems just and proper.

Dated: February __, 2026                    Respectfully submitted,

*/s/ Jennifer W. Corinis*
Jennifer W. Corinis
Fla. Bar No. 49095
Corinis Law PLLC
980 Main St.,
Safety Harbor, FL 34695-3157
Telephone: (727) 222-3142
Email: jen@corinislaw.com

                                                        Attorney for Plaintiff

Case 8:26-cv-00445 Document 1 Filed 02/17/26 Page 10 of 10 PageID 10